1
2
3
4
5

**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

\* \* \*

6   United States of America,                          Case No. 2:21-cr-00024-APG-DJA

7                           Plaintiff,

8        v.                                          **REPORT AND RECOMMENDATION**

9   Victor Ramone Wright,

10                          Defendant.

11

12        Defendant Victor Ramone Wright is charged in a one count Indictment with Felon in

13   Possession of a Firearm in violation of Title 18 U.S.C. 922(g)(1) and 924(a)(2).  (ECF No. 1).

14   Wright moves to suppress the evidence of a firearm and ammunition found within the vehicle in

15   which he was a passenger because his stop, detention, and subsequent search violated the Fourth

16   Amendment to the United States Constitution.  (ECF No. 55).  He also moves to suppress the

17   DNA found as a result of a search warrant.  The Government opposed the motion.  (ECF No. 59).

18   Wright replied.  (ECF No. 64).

19        The Court held an evidentiary hearing on March 30, 2023, at which time exhibits were

20   admitted into evidence and three Las Vegas Metropolitan Police Department Officers were called

21   as witnesses.  The Court also ordered supplemental briefing as a result of evidence entered at the

22   hearing, which briefs were timely filed on June 21, 2023.

23        The Court recommends granting in part and denying in part Wright's motion to suppress.

24   Because the Court finds that the stop, detention and search of the vehicle did not violate Wright's

25   constitutional rights, it recommends denying Wright's request to suppress evidence of the firearm

26   and ammunition found in the vehicle.  Because the Court finds that the search warrant was

27   supported by probable cause, it recommends denying Wright's request to suppress the firearm,

28   ammunition, and DNA obtained as a result of the search of the vehicle and Wright's person.

Because officers questioned Wright while he was in custody without first providing *Miranda*
warnings, the Court recommends granting Wright's request to suppress his pre-*Miranda*
statements.

## PROCEDURAL AND FACTUAL BACKGROUND[1]

On September 11, 2020, a Las Vegas Metropolitan Police Department (LVMPD)
counterterrorism detective contacted members of the LVMPD Flex Team—a special team that
assists in other investigations, including surveillance, narcotics investigations and apprehension
of suspects—to ask for their assistance in apprehending a suspect, serving that suspect with
temporary protective orders, and further investigating whether that suspect was unlawfully
possessing firearms. (ECF No. 55-2 at 10-13). The suspect, defendant Victor Wright, is a three-
time convicted felon who had recently lost his job at the University of Nevada, Las Vegas
(UNLV) and had sent a photo of himself at a shooting range holding a large rifle to a friend over
Facebook Messenger. (*Id.* at 9-10). The friend to whom Wright sent the photo reported it to
authorities. (*Id.*). Wright's friend was concerned because Wright had just lost his job, Wright
had told his friend that Wright was a violent person who could not possess guns, and because
Wright's friend was concerned Wright may take further action against UNLV or others. (*Id.*).

The counterterrorism detective informed Flex Team investigators that detectives had
conducted further investigation and learned that Wright was no longer living at the address where
he was required, was instead living at an address on Cavern Cove Way, and that Wright was
registered as a convicted felon. (*Id.* at 11); (ECF No. 55 at 4). Additionally, according to
Wright's grandmother-in-law and her daughter, Wright had recently appeared at their residence
with a silver handgun in his waistband and threatened them over a custody dispute between
Wright and his grandmother-in-law, threats which continued later via text messages. (ECF No.
79 at 11). Those family members indicated that they had seen Wright regularly place the silver

---

[1] These facts are gleaned from the testimony and exhibits presented at the evidentiary hearing.
The Court does not find it necessary to summarize each witness's testimony as the facts outlined
herein are the finding of facts made by the Court based on the testimony which was relevant to
the issues addressed in this Report and Recommendation.

1    handgun in the center console of an older white Chevrolet Impala that Wright drove. (*Id.*). They

2    also informed detectives that they had obtained two protective orders against Wright that

3    remained unserved. (ECF No. 79 at 25-26). Given this, the counterterrorism team requested the

4    Flex Team's assistance in taking Wright into custody for being an ex-felon failing to change his

5    registration, to further investigate him for possessing firearms, and to serve him the protective

6    orders. (ECF No. 55-2 at 12-13).

7        Flex Team officer Aaron Behymer testified that, the same evening, he traveled to the

8    address where Wright was registered and supposed to be residing. (ECF No. 79 at 26-28). The

9    residents at that address confirmed Wright was no longer living there and provided Behymer with

10   Wright's new address. (*Id.*). Behymer traveled to Wright's new address to set up surveillance

11   and immediately observed an individual he believed to be Wright in the open garage. (*Id.* at 28-

12   29). Behymer surveilled Wright for approximately one hour during which time he saw Wright

13   move items from vehicles on the property to another vehicle on the property: a grey Kia Optima

14   with Florida plates. (*Id.* at 29-31); (ECF No. 55 at 5). Wright moved bags, luggage and other

15   smaller items from the other vehicles—including a white Chevrolet Impala—into the grey sedan.

16   (ECF No. 79 at 29-31). Wright also entered and exited the residence freely on at least two

17   occasions and spent time doing something in the Kia Optima. (*Id.*). Behymer testified it was the

18   Flex Team's plan to wait for Wright to hopefully leave the house so they could conduct a traffic

19   stop on the vehicle to confirm his identity. (*Id.* at 35-39). The Flex Team did not want to try to

20   arrest Wright at the residence as that could lead to a barricade situation, and they were unaware

21   who else might be in the house or what weapons might be stored there. (*Id.*).

22       After about an hour at the residence, Behymer saw Wright and an unidentified female enter

23   the Kia Optima and leave the residence. (*Id.*). Behymer radioed to other Flex Team members

24   that Wright had left and began following the Optima. (*Id.*). Behymer observed the vehicle fail to

25   utilize a turn signal and fail to come to a complete stop at a stop sign. (*Id.*). Behymer, who was

26   in an unmarked vehicle, radioed members in marked patrol cars that he witnessed the traffic

27   infractions and requested that they conduct a traffic stop on the vehicle. (*Id.*). Behymer testified

28   that his intent in conducting a traffic stop was to confirm Wright's identity and to keep the

situation calm because the occupants of the Optima would be less likely to be suspicious of a larger investigation. (*Id.*). Behymer and other officers who were on the scene testified that, once they had confirmed Wright's identity, Wright was under arrest and not free to leave. (*Id.* at 41). Behymer and other officers testified that they did not immediately place Wright in handcuffs to keep the situation calm and allow them to continue their investigation, including obtaining a search warrant for the Optima if the driver would not consent to a search of the vehicle. (*Id.* at 108-110).

Behymer and other officers testified that they thought the Optima may contain a weapon for several reasons. Wright's family had informed officers that Wright carried a silver handgun in his waistband and would put it in the center console of his vehicle. (*Id.* at 21, 26). As a convicted felon and prohibited person, officers believed Wright would likely keep his weapons for a long time and keep them on his person because prohibited persons—like Wright—face more difficulty in obtaining weapons. (*Id.* at 16, 42-43, 89-90, 116). Moreover, Wright had been seen with a weapon in the weeks and days prior to September 11th. (*Id.* at 21). Additionally, Wright's criminal history included multiple offenses involving weapons. (*Id.* at 25). And when Behymer surveilled Wright earlier in the evening, Behymer observed Wright moving packages from the residence and vehicles—including the one Wright typically drove and in which family members had seen him keep a handgun—to the one in which he was stopped, which packages easily could have contained a firearm. (*Id.* at 29-33). For these reasons, officers asked the driver—the unidentified female with whom Wright was traveling—to search the car, which request the driver denied. (*Id.* at 148). Simultaneously, another officer began preparing a search warrant with an accompanying affidavit to search the car. (*Id.*).

During his testimony, Behymer explained the search warrant procedure LVMPD uses. (*Id.* at 45-49). He added that, on the evening he was investigating Wright, he and other officers working on the warrant decided to return to their command center to prepare the warrant and affidavit. (*Id.*). He explained that once it was completed, it would be reviewed and approved by a supervisor. (*Id.*). It would then be approved by a district attorney before calling the judge and

1   sending it for the judge's approval.  (*Id.*).  Behymer testified this process took approximately 3-4

2   hours.  (*Id.* at 66).

3          After obtaining the warrant, officers conducted a search of the vehicle.  (ECF No. 55-3 at

4   3).  During that search, officers found the silver handgun underneath a child's car seat in the back

5   of the Optima.  (*Id.*).  Officers also found a holster and ammunition.  (*Id.*).  This weapon forms

6   the basis for the charge in the indictment.  Officers also conducted a buccal swab of Wright for

7   his DNA.  (*Id.*).  After a search of the vehicle, officers transported Wright to the Clark County

8   Detention Center and the state charged him with both convicted person failure to register and

9   possession of a gun by a prohibited person.  (*Id.*).

10          Wright's motion and supplement includes three requests, which the Court addresses in the

11   following order.  First, that the Court apply an adverse credibility determination to the testimony

12   of Officers Anthony Gariano and Kyle Londergan—the officers who searched Wright's vehicle—

13   because they did not activate their body worn cameras ("BWC") during their search.  Second, that

14   the Court suppress Wright's statements made after the vehicle stop but before officers read his

15   *Miranda* rights.  And third, that the Court suppress the firearm and ammunition officers found

16   when searching the vehicle and the DNA obtained from Wright under the search warrant.

### LEGAL STANDARDS AND ANALYSIS

**I.    The Court declines to consider Officers Gariano and Londgren's credibility to be adversely impacted by the fact that they turned off their BWC.**

20          Wright requests that the Court make an adverse credibility finding as to Officers Gariano

21   and Londergan because they did not activate their BWC during their search of the cars and

22   Cavern Cove residence.  (ECF No. 82).  Wright points out that the only BWC footage available

23   was from before and after the searches.  Wright asks the Court to conclude that the officers

24   elected to turn off their cameras during the period when the search occurred contrary to LVMPD

25   policy.  Wright attached LVMPD's 2020 policy on BWC activation, which states that "[o]fficers

26   will record in the following circumstances…5. Detentions or investigations pursuant to an arrest;

27   6. Searches of persons, structures, or vehicles…"  (ECF No. 82-1 at 3).

28

However, based on officer testimony, it is unclear whether that policy was in place at the time the officers conducted the search. (ECF No. 79 at 157-58, 205). Although Wright attached the 2020 policy, there is still a question of when during the year of 2020 the policy contained therein was implemented. There also remains the question of whether this policy was at odds with a previous policy that prohibited officers from turning on their BWC during searches. (*Id.* at 161-62, 205). Given these discrepancies, the Court lacks sufficient information to determine that an adverse credibility finding is warranted here

II.    **The Court recommends granting Wright's motion to suppress in part regarding his statements made after the vehicle stop but before officers read his *Miranda* rights.**

The Fifth Amendment provides that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, the Supreme Court adopted prophylactic procedural measures to guarantee that a suspect is advised of his Fifth Amendment rights before custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 444–45 (1966). These protections are constitutional in nature. *See Dickerson v. United States*, 530 U.S. 428, 432 (2000). In cases where the suspect has not formally been taken into police custody, a suspect is nevertheless considered "in custody" for purposes of *Miranda* if the suspect has been "deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444. "[F]ailure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004).

The Court recommends granting Wright's motion to suppress in part regarding his statements before officers read him his *Miranda* rights because Wright was in custody. As outlined more fully below, the officers involved in Wright's arrest testified that Wright was under arrest for ex-felon-failure-to-register as soon as they confirmed his identity. (ECF No. 79 at 41-42); (*Id.* at 106-107); (*Id.* at 191, 202). These officers testified that Wright was not free to leave, even though they did not place handcuffs on him. (*Id.* at 41-42, 79, 105-107, 134, 191, 202). Wright was thus in custody and was entitled under *Miranda* to be advised of his Fifth Amendment rights before officers interrogated him. However, officers did not inform Wright of

his *Miranda* rights until about five hours after stopping and arresting him. (*Id.* at 134-35). The Court thus finds that officers violated Wright's *Miranda* rights and recommends that Wright's motion to suppress be granted in part regarding his pre-*Miranda* statements.

**III.    The Court recommends denying Wright's motion to suppress in part regarding the firearm, ammunition, and Wright's DNA.**

Wright makes two arguments in support of his motion to suppress. First, that officers unlawfully prolonged their *Terry* stop of Wright and the Kia Optima and violated state law in detaining Wright for over four hours. Second, that the search warrant under which officers obtained the firearm, ammunition, and Wright's DNA was not supported by probable cause.

> ***A.    Officers did not unlawfully prolong the stop or violate state law because they had reasonable suspicion to stop Wright and officers arrested him once they confirmed his identity.***

Wright's argument that officers unlawfully prolonged the *Terry* stop of Wright and the Kia Optima and violated state law in detaining Wright for over four hours fails for three reasons. First, the officers' initial *Terry* stop was supported by reasonable suspicion that Wright was committing the crimes of failing to register his current address and being in possession of a firearm. Second, once the officers stopped Wright and identified him, they placed him under arrest, ending the *Terry* stop. Third, officers did not violate Nevada law by conducting a too-long traffic stop because the stop was never a traffic stop. Instead, the traffic stop was a lawful ruse designed to obscure the motive behind the investigation.

1.    The officers had reasonable suspicion to conduct the stop.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, a warrant is required to ensure a search's reasonableness. *Maryland v. Dyson*, 527 U.S. 465, 466 (1999). Thus, a warrantless search or seizure is presumed unreasonable unless it falls into a "specifically established and well-delineated exception[ ]." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. United States*, 389 U.S. 347, 356 (1967)). For example, in *Terry v. Ohio*, the Supreme Court determined that a suspect on the street could be

briefly detained and investigated without a warrant when an officer has "a reasonable suspicion of criminal activity based on 'specific and articulable facts and rational inferences from those facts.'" *Terry*, 392 U.S. 1, 19, 21 (1968); *Florida v. Royer*, 460 U.S. 491, 512 (1983). This principle extends to traffic stops, which are "more analogous to a so-called '*Terry* stop' ... than to a formal arrest." *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984).

"The standard for determining whether probable cause or reasonable suspicion exists is an objective one; it does not turn either on the subjective thought processes of the officer or on whether the officer is truthful about the reason for the stop." *U.S. v. Magallon-Lopez*, 817 F.3d 671, 675 (9th Cir. 2016). "If, for example, the facts provide probable cause or reasonable suspicion to justify a traffic stop, the stop is lawful even if the officer made the stop only because he wished to investigate a more serious offense." *Id.* (citing *Whren v. United States*, 517 U.S. 806, 812-13 (1996)). In other words, an otherwise reasonable traffic stop is not rendered unreasonable because it was made as a pretext to investigate unrelated suspected illegal activity. *U.S. v. Ibarra*, 345 F.3d 711, 713-14 (9th Cir. 2003).

The Court finds that officers had reasonable suspicion to believe that Wright was engaged in criminal activity—specifically, ex-felon-failure-to-register and felon-in-possession-of-a-firearm—sufficient for them to stop the vehicle in which he was riding to investigate and identify him. Regarding the felon-in-possession investigation, Wright had sent a photo of himself with an assault rifle to a friend a few days before officers arrested Wright. While the rifle was borrowed from a gun range, the photo indicated that Wright was at least inclined to possess weapons despite his prohibited status. On the day of Wright's arrest, Wright's family members also explained to officers that Wright had shown up at their house with a handgun the previous week. They added that they had seen Wright with the handgun before and had seen him place it in the console of his car. Officers also testified that, based on their training, prohibited persons typically kept their firearms on their persons because firearms are so difficult to obtain as a prohibited person. Wright's family members' statements about witnessing Wright with the same handgun on multiple occasions squared with officers' experience that prohibited persons typically kept their

firearms on their person. Officers thus had reasonable suspicion that Wright would have the handgun on his person.

Officers also had reasonable suspicion that the individual in the Kia Optima was Wright for the purposes of their ex-felon-failure-to-register arrest. Wright's family members informed officers that Wright no longer lived at his registered address. Officers then followed up, visiting the registered address and speaking with the residents there. Those residents informed officers that Wright no longer lived there and gave officers Wright's new Cavern Cove address. Officers then set up surveillance of the Cavern Cove residence and witnessed a white Chevrolet Impala matching the description that Wright's family members gave of his car. Officers also witnessed a man matching Wright's description moving in and out of the residence freely. Officers then watched as the man matching Wright's description moved personal items and luggage—which could conceal a firearm—out of the house and out of other cars—including the Chevrolet Impala—into the Kia Optima. Taking Wright's family's statements that Wright often kept a handgun in the console of the car he drove together with officers' observations that a man matching Wright's description moved items out of the Cavern Cove residence and the Chevrolet Impala into the Kia Optima, the Court finds that officers had reasonable suspicion to believe that Wright did not register his address, that Wright was the individual they were surveilling, and that Wright had a handgun inside the Kia Optima.

Finally, the officers' stop was lawful even though they used the traffic violations as a reason for stopping the Kia Optima. Officers determined that the driver of the Optima had made two traffic violations— failing to use a turn signal and to come to a complete stop at a stop sign —that justified the traffic stop. And just because the only reason the officers conducted the stop was to investigate Wright does not make the stop unreasonable or unlawful. Additionally, although Wright initially asserted that no traffic violation occurred, he made that argument in support of his request for an evidentiary hearing, which request the Court granted. (ECF No. 55 at 10). After that hearing, Wright did not renew his assertions that no violation occurred in his supplemental briefing. The Court thus finds that officers had reasonable suspicion to stop the Optima.

2.    Officers did not prolong the stop because Wright was under arrest immediately after officers identified him.[2]

Under the Fourth Amendment, a warrantless arrest requires probable cause. *See Michigan v. Summers*, 452 U.S. 692, 700 (1981). Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Alternatively, the Ninth Circuit has defined probable cause as follows: when "under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the defendant] had committed a crime." *United States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986). While conclusive evidence of guilt is of course not necessary under this standard to establish probable cause, "[m]ere suspicion, common rumor, or even strong reason to suspect are not enough." *McKenzie v. Lamb*, 738 F.2d 1005, 1008 (9th Cir. 1984) (citing *Henry v. United States*, 361 U.S. 98, 101 (1959)). In the context of an arrest, handcuffing is a substantial factor in determining whether an individual has been arrested; however, handcuffing alone is not determinative. *See U.S. v. Bravo*, 295 F.3d 1002, 1009-1010 (9th Cir. 2002) (addressing handcuffing in the context of when a *Terry* stop becomes an arrest).

Here, officers did not unlawfully prolong their stop of Wright because, once they identified Wright, he was under arrest and the stop was no longer a *Terry* stop. Although Wright asserts that officers wrongfully prolonged their *Terry* stop of his vehicle, every officer testified at the hearing that Wright was under arrest as soon as they confirmed his identity. (ECF No. 79 at

---

[2] The United States filed a notice of the Ninth Circuit's ruling in *United States v. Taylor*. (ECF No. 69). The United States assert that the case is relevant because, in it, the Ninth Circuit determined that officers could conduct ordinary inquiries incident to a traffic stop such as asking a driver for identification, whether the driver had been arrested before, and whether the driver had any weapons in the vehicle without prolonging the stop. *See United States v. Taylor*, 60 F.4th 1233, 1239 (9th Cir. 2023). The Court does not address this case here because it has determined that officers arrested Wright immediately upon identifying him. Once Wright was under arrest, the stop was no longer a *Terry* stop and thus, officers could not have prolonged the stop. *United States v. Taylor* thus does not guide the Court's analysis.

41-42); (*Id.* at 106-107); (*Id.* at 191, 202).  Specifically, officers arrested him for being an ex-felon but failing to register his current address.  (*Id.* at 106-107).  Officer Londergan explained that officers did not handcuff Wright to ensure that Wright would remain relaxed.  (*Id.* at 106-110).  Officer Londergan added that, in his experience, individuals who are handcuffed can become a risk to officer safety.  (*Id.* at 106-110).  And because other officers on the Flex Team were securing a warrant for the vehicle, it was important for the arresting officers to keep Wright relaxed to give the other officers the opportunity to obtain the warrant.  (*Id.*).

Because officers arrested Wright immediately after identifying him, the Court finds that the stop was not a *Terry* stop and thus, Wright's arguments that officers wrongfully prolonged the *Terry* stop are inapplicable here.  Further, the Court finds that the officers had probable cause to effectuate the warrantless arrest of Wright.  Under the totality of the circumstances, there was a fair probability that Wright had not registered his current address.  Wright's family members informed officers that Wright no longer lived at his registered address.  Officers then followed up, visiting the registered address and speaking with the residents there.  Those residents informed officers that Wright no longer lived there and gave officers Wright's new Cavern Cove address.  Officers then witnessed a man matching Wright's description moving into and out of the Cavern Cove residence in a casual manner, suggesting that he lived there.  They also witnessed a car matching the description Wright's family gave of the car Wright drove parked at the house.  And when officers pulled Wright over and positively identified him, they confirmed that Wright had been the individual moving in and out of the un-registered address.

           3.      <u>Officers did not violate Nevada law by detaining Wright for hours.</u>

Under NRS 171.123(4), temporary detentions may only last sixty minutes.  However, under NRS 171.1231, "[a]t any time after the onset of the detention pursuant to NRS 171.123, the person so detained shall be arrested if probable cause for an arrest appears."  Wright also cites to LVMPD policy which provides that "[t]he detention on a traffic stop…must remain minimal.  Officers will not detain drivers or passengers for longer than is necessary to confirm the driving privilege status and to issue the citation or give a warning.  In no event can the detention exceed sixty (60) minutes."  (ECF No. 55-5 at 3).

Wright's argument that officers violated NRS 171.123 and LVMPD policy by detaining him for longer than sixty minutes fails because Wright was arrested immediately after officers identified him and because the traffic violation for which officers stopped the Kia Optima was a ruse. As outlined more fully above, officers testified that the intent of the stop was to take Wright into custody for being an ex-felon and failing to register his current address and to investigate whether he was in possession of a firearm. (ECF No. 79 at 35). And, as also outlined above, it was not unlawful for officers to use a traffic stop as a pretext to investigate this unrelated suspected illegal activity. Finally, as soon as officers identified Wright, he was under arrest and the detention ended under NRS 171.1231.

### B.    The search warrant under which officers obtained the firearm, ammunition, and DNA was supported by probable cause.

Probable cause exists when "under the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Luong*, 470 F.3d 898, 902 (9th Cir. 2006) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). "Probable cause determinations are 'commonsense, practical' questions, and a 'fair probability' is less even than a preponderance of the evidence." *United States v. Flores*, 802 F.3d 1028, 1044 (9th Cir. 2015) (quoting *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc)). "Probable cause in a search warrant affidavit must be based on the material supplied by the affiant as well as 'reasonable inferences' drawn from the material." *United States v. Bundy*, 195 F.Supp.3d 1170, 1174 (D. Or. 2016) (quoting *Gates*, 462 U.S. at 238). Additionally, an issuing judge's probable cause determination "should be paid great deference by reviewing courts." *Spinelli v. United States*, 393 U.S. 410, 419 (1969) (abrogated on other grounds by *Gates*, 462 U.S. at 213).

Here, the search warrant was valid and set forth probable cause that firearm evidence would be found in the Kia Optima and that DNA evidence would confirm that Wright was the individual officers witnessed at the Cavern Cove residence. Wright's arguments regarding probable cause ask the Court to take the picture Wright sent to his friend, the investigating officers' observations, and officers' discussions with Wright's family in isolation rather than

considering the totality of the circumstances. While each piece of evidence included in the search warrant might not establish probable cause on its own, when taken together, the evidence establishes probable cause. Wright had sent a picture of himself with a firearm to a friend, indicating that he was inclined to handle firearms despite his prohibited status. And when officers arrived at his reported address, Wright's family indicated that he no longer lived there and that he was known to carry a firearm and place it in the console of the car he drove. Residents at the address where Wright was supposed to be residing gave officers Wright's new Cavern Cove address and, when officers established surveillance at that residence, they saw an individual matching Wright's description and a car matching Wright's family's description in parked in front. The individual was walking in and out of the house in a manner that indicated to officers that he likely lived there. This was sufficient to establish probable cause that Wright lived at the Cavern Cove residence and that DNA evidence would confirm that. And although Wright ultimately left in a different car, given officers' experience that prohibited persons usually keep firearms on their person and Wright's family's statements that they had seen Wright place his firearm in a car console multiple times, the affidavit established probable cause to search the Kia Optima for a firearm.

1. <u>Even if the warrant was not supported by probable cause, the good faith exception applies.</u>

"Evidence seized pursuant to a facially valid search warrant that later is held to be invalid may nevertheless be admissible if officers conducting the search acted in good faith and in reasonable reliance on the warrant." *United States v. Kow*, 58 F.3d 423, 428 (9th Cir. 1995) (citing *United States v. Leon*, 468 U.S. 897, 926 (1984)). The good faith exception does not apply, however,

> (1) where the affiant recklessly or knowingly placed false information in the affidavit that misled the issuing judge; (2) where the judge wholly abandon[s] his [or her] judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where the warrant is so facially deficient—i.e., in failing to particularize

the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid.

*United States v. Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013) (internal quotations omitted).

"The government bears the burden of proving that reliance upon the warrant was objectively reasonable." *Kow*, 58 F.3d at 428. Regarding the third instance when the good faith exception does not apply, an affidavit is so lacking in indicia of probable cause when it fails to provide a colorable argument for probable cause. *Underwood*, 725 F.3d 1076, 1085 (9th Cir. 2013). A colorable argument is when "thoughtful and competent judges" could disagree that probable cause does not exist. *Id.*

Here, the Court finds that, even if the search warrant was not supported by probable cause, the good faith exception applies. Wright argues that the warrant was so lacking in indicia of probable cause that officers should have known that the search was illegal. However, given the fact that both the issuing judge and the undersigned believe that there was sufficient probable cause to support the warrant, the Court finds that it was objectively reasonable for officers to rely on the warrant. As outlined above, the warrant provides a colorable argument for probable cause such that at least two judges have agreed that probable cause exists.

## **RECOMMENDATION**

**IT IS THEREFORE RECOMMENDED** that Wright's motion to suppress (ECF No. 55) be **granted in part and denied in part**. It is recommended that the motion be granted regarding Wright's request to suppress his statements made before officers informed him of his *Miranda* rights. It is recommended that the motion be denied regarding Wright's request that the DNA, ammunition, and firearm be suppressed.

## **NOTICE**

This report and recommendation is submitted to the United States District Judge assigned to this case under 28 U.S.C. § 636(b)(1). A party who objects to this report and recommendation

may file a written objection supported by points and authorities within fourteen days of being served with this report and recommendation.  Local Rule IB 3-2(a).  Failure to file a timely objection may waive the right to appeal the district court's order.  *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991).

DATED: August 15, 2023

_____
DANIEL J. ALBREGTS.
UNITED STATES MAGISTRATE JUDGE